## In re DONALDSON COMPANY, INC.

### No. 91–1386.

United States Court of Appeals,
Federal Circuit.

Feb. 14, 1994.

R. Carl Moy, Merchant, Gould, Smith, Edell, Welter & Schmidt, P.A., of Minneapolis, Minnesota, argued for appellant.

Fred E. McKelvey, Solicitor, Office of the Solicitor, of Arlington, Virginia, argued for appellee. With him on the brief were Richard E. Schafer, Associate Solicitor and James T. Carmichael, Assistant Solicitor. Of counsel was Albin F. Drost.

Herbert I. Cantor, Wegner, Cantor, Mueller & Player, of Washington, D.C., was on the brief for Amicus Curiae, Bar Association of the District of Columbia. With him on the

brief were John W. Schneller, Chair, Patent, Trademark and Copyright Section and Anthony W. Shaw, Chair, Amicus Committee.

William L. LaFuze, Vinson & Elkins, of Houston, Texas, was on the brief for Amicus Curiae, American Intellectual Property Law Association. With him on the brief were Nancy J. Linck, Cushman, Darby & Cushman, Washington, D.C., Harold C. Wegner, Wegner, Cantor, Mueller & Player, Washington, D.C. and H. Ross Workman, Workman, Nydegger & Jensen, of Salt Lake City, Utah, of counsel.

Before NIES, Chief Judge, and RICH, NEWMAN, ARCHER, MAYER, MICHEL, PLAGER, LOURIE, CLEVENGER, RADER, and SCHALL, Circuit Judges.

RICH, Circuit Judge.

The Donaldson Company (Donaldson) appeals from the January 30, 1991 decision of the Board of Patent Appeals and Interferences (Board) of the United States Patent and Trademark Office (PTO), reaffirmed on reconsideration on April 17, 1991, sustaining the Examiner's rejection of claim 1 of reexamination application Serial No. 90/001,776 [1] (Schuler application) under 35 U.S.C. § 103. We reverse.

## I. BACKGROUND

### A. The Invention

The present invention relates to industrial air-filtering devices often referred to as "dust collectors." Fig. 2 of the Schuler application is reproduced below.

FIG. 2

---

**1.** Reexamination application Serial No. 90/001,776, filed on May 18, 1989, is for a reexamination of U.S. Patent No. 4,395,269 (Schuler Patent), assigned to Donaldson.

In operation, dust-laden air enters dirty-air chamber (22) through air inlet (20) at the top, passes through filters (32), and then exits through clean-air outlet (64) at the left. During this process, dust is collected on the outside of the filters. To periodically dislodge accumulated dust from the filters, the Schuler collector includes valve and nozzle assemblies (65), which direct jets of compressed air into the hollow interior of each filter. In doing so, the normal direction of air flow is reversed, thus dislodging a substantial portion of the dust accumulated on the outside of each filter. The dislodged dust then falls through the dirty-air chamber and accumulates at the bottom of the chamber in hopper (25), where it is removed by auger screw (68).

One problem with conventional collectors is that the dust accumulated in the hopper tends to harden or cake, thus interfering with the free movement of the accumulated dust downward to the auger screw. To overcome this problem, the Schuler collector takes advantage of the fact that every pulse of air from the nozzles causes the pressure within the dirty-air chamber to increase momentarily. At least one wall of the hopper of the Schuler collector (24) is made from a flexible material which in essence transforms the hopper into a diaphragm-like structure which expands outward in response to the temporary pressure increases. This movement breaks up any dust that may have hardened or caked onto the hopper. This flexible-wall, diaphragm-like structure also provides the additional advantages of deadening the sounds of the cleaning pulses and expanding the volume of the dirty-air chamber, thus allowing the air pulses to act more vigorously on the filters.

Claim 1, the only claim on appeal, reads, with insertion of reference numerals in brackets, as follows:

An air filter assembly [10] for filtering air laden with particulate matter, said assembly [10] comprising:

a housing having a clean air chamber [60] and a filtering chamber [22], said housing having an upper wall [16], a closed bottom [26], and a plurality of side walls [17, 62] depending from said upper wall [16];

a clean air outlet [64] from said clean air chamber [60] in one of said side walls [62];

a dirty air inlet [20] to said filtering chamber [22] positioned in a wall [16] of said housing in a location generally above said clean air outlet [64];

means [28] separating said clean air chamber [60] from said filtering chamber [22] including means mounting a plurality of spaced-apart filter elements [32] within said filtering chamber [22], with each of said elements [32] being in fluid communication with said air outlet [64];

pulse-jet cleaning means [65], intermediate said outlet [64] and said filter elements [32], for cleaning each of said filter elements [32]; and

a lowermost portion [25] in said filtering chamber [22] arranged and constructed for the collection of particulate matter, said portion [25] having *means [24], responsive to pressure increases in said chamber [22] caused by said cleaning means [65], for moving particulate matter in a downward direction* to a bottommost point [68] in said portion [25] for subsequent transfer to a location exterior to said assembly [10]. [Emphasis ours.]

## B. *The Board Decision*

In its initial January 30, 1991 decision, the Board relied solely upon the dust collector disclosed in U.S. Patent No. 3,421,295 (Swift patent) to affirm the Examiner's rejection of claim 1. The Board did not find the secondary references relied upon by the Examiner[2] necessary to sustain the rejection. Swift's dust collector, illustrated below by Fig. 2 of the Swift patent, uses pulses of compressed, high-energy gas to counteract normal filter flow. These pulses of compressed gas dislodge particulate matter from spaced-apart filter elements (14), and the dislodged particulate matter moves towards the bottom of the hopper (16).

2. The other references were U.S. Patent No. 4,409,009 issued to Lissy (Lissy patent) and U.S. Patent No. 2,732,099 issued to Davis (Davis patent).

Fig 2

At page 5 of its initial decision, the Board noted Donaldson's arguments that Swift fails to disclose the use in its dust collector of a flexible surface which flexes in response to the gas pulses therein, but stated that:

> while such a flexible sloping surface is a recited feature of the apparatus of claims 2, 3, and 5, this is *not* the case as to the apparatus of claim 1. Thus, [Donaldson's] argument is of no moment to claim 1. Moreover, we are convinced that hopper 16 of the gas filtering apparatus of Swift is "responsive" to pressure increases in the apparatus caused by the jet-cleaning means whereby filtered particulate matter is caused to move in a downward direction. Thus, we agree with the examiner that there is no apparent distinction between the "lowermost portion" of the apparatus recited in claim 1 and the corresponding portion of the apparatus of Swift.

Thus, the Board did not interpret the "means, responsive to pressure increases in said chamber caused by said cleaning means, for moving particulate matter in a downward direction" language recited in the last paragraph of claim 1 as limited to the flexible wall, diaphragm-like structure disclosed in Schuler's specification, and equivalents thereof. Indeed, the Board specifically stated at page 2 of its decision on reconsideration mailed April 17, 1991:

> It is axiomatic that particular features or limitations appearing in the specification are *not* to be read into the claims of an

application. [citations omitted] Thus, contrary to [Donaldson's] argument, a flexible sloping surface is *not* a feature of the air filtering apparatus of claim 1 which distinguishes it over the air filtering apparatus of Swift.

### C. *Donaldson's Assertions*

For purposes of this appeal, Donaldson effectively concedes that Swift teaches or suggests each and every element of the apparatus recited in Schuler's claim 1 except for the "means, responsive to pressure increases in said chamber caused by said cleaning means, for moving particulate matter in a downward direction" recited in the last segment of claim 1. As to this limitation, Donaldson argues that the Board erred in holding that Swift teaches or suggests such a means as it is described in Schuler's specification. Donaldson further argues that the Board's error in this regard is the result of a fundamental legal error by the Board, namely the Board's failure to obey the statutory mandate of 35 U.S.C. § 112, paragraph six, in construing this claim.

## II. DISCUSSION

### A. *Standard of Review*

■ Obviousness under section 103 is a question of law that this court reviews de novo. *In re Woodruff,* 919 F.2d 1575, 1577, 16 USPQ2d 1934, 1935 (Fed.Cir.1990). Similarly, our precedent is that claim construction, when, as here, there are no underlying factual issues, is also a question of law that we review de novo. *Kalman v. Kimberly–Clark Corp.,* 713 F.2d 760, 771, 218 USPQ 781, 789 (Fed.Cir.), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984). In this case, the PTO erred in its construction of the "means-plus-function" language recited in the last segment of Schuler's claim 1, and this error consequently led the PTO to impose an improper obviousness rejection.

### B. *35 U.S.C. § 112, Paragraph Six*

■ When statutory interpretation is at issue, the plain and unambiguous meaning of a statute prevails in the absence of clearly

expressed legislative intent to the contrary. *See Mansell v. Mansell,* 490 U.S. 581, 592, 109 S.Ct. 2023, 2030, 104 L.Ed.2d 675 (1989); *Hoechst Aktiengesellschaft v. Quigg,* 917 F.2d 522, 526, 16 USPQ2d 1549, 1552 (Fed. Cir.1990). The statutory language at issue in this case reads:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim *shall be construed* to cover the corresponding structure, material, or acts described in the specification and equivalents thereof. [Emphasis ours.]

35 U.S.C. § 112, paragraph 6 (1988).

■ The plain and unambiguous meaning of paragraph six is that one construing means-plus-function language in a claim must look to the specification and interpret that language in light of the corresponding structure, material, or acts described therein, and equivalents thereof, to the extent that the specification provides such disclosure. Para-graph six does not state or even suggest that the PTO is exempt from this mandate, and there is no legislative history indicating that Congress intended that the PTO should be.[3] Thus, this court must accept the plain and precise language of paragraph six. *See Mansell supra; see also Diamond v. Chakrabarty,* 447 U.S. 303, 308, 100 S.Ct. 2204, 2207, 65 L.Ed.2d 144 (1980) ("courts 'should not read into the patent laws limitations and conditions which the legislature has not expressed' "), *quoting United States v. Dubilier Condenser Corp.,* 289 U.S. 178, 199, 53 S.Ct. 554, 561, 77 L.Ed. 1114 (1933). Accordingly, because no distinction is made in paragraph six between prosecution in the PTO and enforcement in the courts, or between validity and infringement, we hold that paragraph six applies regardless of the context in which the interpretation of means-plus-function language arises, i.e., whether as part of a patentability determination in the PTO or as part of a validity or infringement determination in a court.[4] To the extent that *In re Lundberg,* 244 F.2d 543, 113 USPQ 530 (CCPA 1957), *In re Arbeit,* 206 F.2d 947, 99

---

3. There is no evidence that, at the time of the Act of July 24, 1965, Pub.L. No. 89–83, § 9, 1965 U.S.C.C.A.N. (79 Stat.) 259, or the Act of Nov. 14, 1975, Pub.L. No. 94–131, § 7, 1975 U.S.C.C.A.N. (89 Stat.) 685, which reenacted the third paragraph of section 112, now the sixth paragraph, Congress was specifically aware of the PTO's allegedly sweeping practice of interpreting means-plus-function language as reading on each and every means of performing that function, or of any CCPA decision condoning such a practice, and we do not find this reenactment without awareness to indicate clear Congressional approval or disapproval. *See AFL–CIO v. Brock,* 835 F.2d 912, 916 n. 6 (D.C.Cir. 1987) (stating that no case has rested merely on presumptive knowledge, noting that, in *Lindahl v. OPM,* 470 U.S. 768, 782–86, 105 S.Ct. 1620, 1628–31, 84 L.Ed.2d 674 (1984), relied upon by the Commissioner here, there was evidence in the legislative history that Congress was aware of the particular interpretation at issue), *citing with approval,* C. Sands, SUTHERLAND ON STATUTORY CONSTRUCTION, § 49.09 (4th ed. 1984) (rule of implied adoption of agency interpretation does not apply where nothing indicates that the legislature had its attention directed to such interpretation upon reenactment.); *see also General American Transp. v. Interstate Commerce Comm.,* 872 F.2d 1048, 1053 (D.C.Cir.1989). In addition, P.J. Federico's post-ACT "Commentary on the New Patent Act," 35 U.S.C.A. § 1 (1954 ed., West), *reprinted in* 75 JPOS 162 (1993), is not legislative history per se that may be relied upon to indicate Congressional intent. Even if it were, the comments contained therein do not suggest that Federico knew of any particular intent *by Congress* regarding the manner in which the sixth paragraph, then the third paragraph, should be applied. In this particular, he was merely stating his personal views.

4. *Accord, Arrhythmia Research Technology,* 958 F.2d 1053, 1060, 22 USPQ2d 1033, 1038 (Fed. Cir.1992) (infringement determination); *In re Bond,* 910 F.2d 831, 833, 15 USPQ2d 1566, 1568 (Fed.Cir.1990) (patentability over prior art determination); *In re Iwahashi,* 888 F.2d 1370, 1375, 12 USPQ2d 1908, 1912 (Fed.Cir.1989); *Johnston v. Ivac Corp.,* 885 F.2d 1574, 1580, 12 USPQ2d 1382, 1386 (Fed.Cir.1989) (infringement determination); *In re Meyer,* 688 F.2d 789, 796, 215 USPQ 193, 199 (CCPA 1982) (section 101 patentability determination); *In re Knowlton,* 481 F.2d 1357, 1366, 178 USPQ 486, 492–93 (CCPA 1973) (patentability determination as to section 112 and prior art); *In re Foster,* 438 F.2d 1011, 1016, 169 USPQ 99, 102 (CCPA 1971) (section 101 patentability determination); *In re Bernhart,* 417 F.2d 1395, 1399, 163 USPQ 611, 615 (CCPA 1969) (section 101 patentability determination); *In re Prater,* 415 F.2d 1393, 1406, 162 USPQ 541, 551–52 (CCPA 1969) (section 103 patentability determination). *See also generally* R. Carl Moy, *The Interpretation of Means Expressions During Prosecution,* 68 JPOS 246 (1986).

USPQ 123 (CCPA 1953), or any other precedent of this court suggests or holds to the contrary, it is expressly overruled.

The Commissioner argues that his interpretation is entitled to deference in view of what the Commissioner alleges is the PTO's sweeping and long-standing practice of not applying paragraph six during examination. We disagree. The fact that the PTO may have failed to adhere to a statutory mandate over an extended period of time does not justify its continuing to do so. In addition, paragraph six facially covers every situation involving the interpretation of means-plus-function language, and the Commissioner's attempts to create an ambiguity in paragraph six where none exists are to no avail. The fact that paragraph six does not specifically state that it applies during prosecution in the PTO does not mean that paragraph six is ambiguous in this respect. Quite the contrary, we interpret the fact that paragraph six fails to distinguish between prosecution in the PTO and enforcement in the courts as indicating that Congress did not intend to create any such distinction.

In addition, section 112 as a whole relates to requirements for the specification and claims without regard to whether a patent or patent application is involved. Moreover, section 112 is found in Chapter 11 of Title 35, titled "Application for Patent," which supports our holding that section 112, paragraph six, governs the interpretation of "means" clauses in a claim for a combination when being examined in pending applications.

The Commissioner argues that Congress enacted paragraph six to codify the "reverse doctrine of equivalents" for means-plus-function claim language, a claim interpretation tool which finds application only in the litigation context, wherefore Congress must have intended paragraph six to apply only in the context of post-issuance infringement and va-

lidity actions. We see no merit in this imaginative reasoning, and no support for it has been cited. The record is clear on why paragraph six was enacted. In *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3 (1946), the Supreme Court held that means-plus-function language could not be employed at the exact point of novelty in a combination claim. Congress enacted paragraph six, originally paragraph three, to statutorily overrule that holding. *See In re Fuetterer*, 319 F.2d 259, 264 n. 11, 138 USPQ 217, 222 n. 11 (CCPA 1963) (noting that it was Congress's intent to restore the law regarding broad functional language in combination claims to its state prior to *Halliburton*). The fact that the question of how to treat means-plus-function language came to Congress's attention through the context of infringement litigation does not suggest that Congress did not intend paragraph six to apply to all interpretations of means-plus-function claim language. Furthermore, there is no legislative history suggesting that Congress's purpose in enacting paragraph six was to codify the reverse doctrine of equivalents,[5] and thus there is no reason to believe that Congress intended to limit the application of paragraph six to post-issuance claim interpretation.

▪ Contrary to suggestions by the Commissioner, our holding does not conflict with the principle that claims are to be given their "broadest reasonable interpretation" during prosecution. *See, e.g., In re Prater*, 415 F.2d 1393, 1404–05, 162 USPQ 541, 550–51 (CCPA 1969).[6] Generally speaking, this claim interpretation principle remains intact. Rather, our holding in this case merely sets a limit on how broadly the PTO may construe means-plus-function language under the rubric of "reasonable interpretation." Per our holding, the "broadest reasonable interpretation" that an examiner may give means-plus-function language is that statutorily mandated in

5. Of course, this is not to say that this may not have been one of the *results* of enacting this paragraph. In *Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580, 12 USPQ2d 1382, 1386–87 (Fed.Cir. 1989), this court noted that paragraph six effectively restricts the scope that one would attribute to means-plus-function language if one were to read it in a vacuum without reference to the specification.

6. Of interest, the *Prater* court distinguished the apparatus claim therein from the process claims at issue on the basis that the apparatus claim employed "typical means-plus-function language as expressly permitted by the third paragraph [now sixth] of 35 U.S.C. § 112." *In re Prater*, 415 F.2d at 1406, 162 USPQ at 551–52.

paragraph six. Accordingly, the PTO may not disregard the structure disclosed in the specification corresponding to such language when rendering a patentability determination.

Our holding similarly does not conflict with the second paragraph of section 112.[7] Indeed, we agree with the general principle espoused in *In re Lundberg*, 244 F.2d at 547–48, 113 USPQ at 534 (CCPA 1979), that the sixth paragraph of section 112 does not exempt an applicant from the requirements of the first two paragraphs of that section. Although paragraph six statutorily provides that one may use means-plus-function language in a claim, one is still subject to the requirement that a claim "particularly point out and distinctly claim" the invention. Therefore, if one employs means-plus-function language in a claim, one must set forth in the specification an adequate disclosure showing what is meant by that language. If an applicant fails to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112.

Also contrary to suggestions by the Commissioner, our holding does not conflict with the general claim construction principle that limitations found only in the specification of a patent or patent application should not be imported or read into a claim. *See In re Priest*, 582 F.2d 33, 37, 199 USPQ 11, 15 (CCPA 1978). The Commissioner confuses impermissibly imputing limitations from the specification into a claim with properly referring to the specification to determine the meaning of a particular word or phrase recited in a claim. *See E.I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433, 7 USPQ2d 1129, 1131 (Fed.Cir. 1988) (discusses importance of distinguishing between the two). What we are dealing with in this case is the construction of a limitation already in the claim in the form of a means-plus-function clause and a statutory mandate on how that clause must be construed.

### C. *Application of Paragraph Six to Claims*

■ For the foregoing reasons, the PTO was required by statute to look to Schuler's specification and construe the "means" language recited in the last segment of claim 1 as limited to the corresponding structure disclosed in the specification and equivalents thereof.[8] The particular means language of claim 1 at issue reads:

> means, responsive to pressure increases in said chamber caused by said cleaning means, for moving particulate matter in a downward direction to a bottommost point in said [lowermost] portion for subsequent transfer to a location exterior to said assembly.

In the "Summary of the Invention" section of his specification, Schuler states:

> A lowermost portion of the assembly is arranged and constructed to collect the removed particulate matter. The collection *portion* includes a sloping surface constructed of a material *which flexes in response to the pressure differentials created within the chamber* during the operation of the pulse-jet cleaning means.
>
> . . . .
>
> [t]he sloping *surface* of the collection portion of the assembly *moves outward, or flexes, as the pressure increases within the chamber* with each operation of the pulse-jet means. The flexing movement allows the air entraining the dust from the filter element to travel towards the collection area, thereby helping to prevent the removed dust from being re-deposited on a neighboring filter element. Also, the flexing surface dampens the noise and vibrations of the pulse jet cleaning means, and moves the dust collected on its surface

---

7. The second paragraph of 35 U.S.C. § 112 reads:

  The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

8. The word "equivalent" in 35 U.S.C. § 112, paragraph 6, should not be confused with the doctrine of equivalents. *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575, 225 USPQ 236, 239 (Fed.Cir.1985); *see also Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 933–34, 4 USPQ2d 1737, 1741 (Fed.Cir.) (en banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).

towards the collection area for subsequent removal from the assembly itself. [Emphasis ours.]

*Schuler Patent,* Col. 2, lines 6–12, 28–39. In discussing a preferred embodiment of his dust collector, Schuler further describes the "means, responsive to pressure" recited in claim 1 as follows:

The larger surface area 24 is designed and arranged to act as a diaphragm which is movably responsive to the pressure differentials created within the dirty air chamber 22 by the operation of the pulse jet cleaning means 65, 66. The diaphragm 24 is preferably made from a flexible, reinforced rubber sheet material. However, any material sufficiently strong and flexible could be used, i.e., a relatively thin metal panel which will flex. The diaphragm movement caused by the operation of the pulse jet cleaning means will be explained in detail below.

*Schuler Patent,* Col. 6, lines 21–31. The further explanation referred to reads:

During the operation of the pulse-jet cleaning means the larger, sloping surface or diaphragm 24 moves outward or away from the filter elements 32 in response to the increase in pressure within the dirty air chamber 22. This outward flexing is shown in broken lines in FIG. 2. As the pressure diminishes, the surface 24 flexes back to its normal position.

The pressure-responsive, flexing movement of the larger sloping surface 24 accomplishes four important functions: (1) the movement allows air entraining the removed dust to move downwardly towards the hopper; (2) it helps prevent the removed dust and particulate matter from being re-deposited onto adjacent elements; (3) it helps to dampen the noise and the vibrations of the pulse-jet cleaning means; and (4) it helps to move the particulate matter which has settled on the diaphragm surface towards the auger screw. As the particulate matter accumulates in the lowermost portion 25 upon the auger screw 68, it is removed, by the operation of the auger screw 68, to a location exterior to the filter assembly. There is nearly zero dirty air velocity at the point adjacent to

the auger screw, as a result of the dirty air inlet not being in nor even adjacent to the particulate matter collection area of the filter assembly.

*Schuler Patent,* Col. 7, lines 42–66.

A review of the foregoing excerpts leads to the inescapable conclusion that Schuler's specification defines the "means, responsive to pressure increases in said chamber ..., for moving particulate matter in a downward direction" language recited in claim 1 as a flexible-wall, diaphragm-like structure, such that the hopper is made up of at least one flexible wall which expands outward upon pressure increases, thus causing caked-on dust to break loose from the wall of the hopper and fall towards the auger screw due to gravity.

## D. *Swift*

The Swift collector does not teach or suggest the flexible-wall, diaphragm-like structure claimed by Schuler. Indeed, there is no teaching or suggestion in Swift that the hopper walls therein be anything but rigid and non-responsive to any pressure increases within the collector. Consequently, it would not have been obvious to one of ordinary skill in the art to modify Swift to obtain Schuler's flexible-wall, diaphragm-like structure. In this regard, we note that the Board itself specifically held at page 6 of its initial decision that the examiner had failed to establish a *prima facie* case of obviousness as to claims 2, 3, and 5, because Swift and the other references relied upon by the examiner

fail to disclose or render obvious the feature of the lowermost portion of the claimed apparatus comprising the flexible sloping surface which flexes in response to increases in pressure in the apparatus caused by the pulse-jet cleaning means whereby filtered particulate matter is moved in a downward direction.

Notwithstanding this explicit holding by the Board that Swift fails to teach or suggest the flexible-wall, diaphragm-like structure that Schuler *discloses* in his specification *as corresponding to the "means" language recited in the last segment of claim 1,* the Commissioner nevertheless argues that the examiner found, and the Board allegedly im-

plicitly agreed, that Swift's hopper walls *respond* to jet-cleaning pressure increases by vibrating, and that Donaldson has failed to establish that this allegedly responsive structure is not an "equivalent" to Schuler's disclosed flexible-wall, diaphragm-like structure. The Commissioner further contends that the slanted hopper walls in Swift's collector satisfy the "means, responsive to pressure" language of claim 1.

The Commissioner's arguments appear to address concepts of anticipation under 35 U.S.C. § 102. However, neither the Examiner nor the Board imposed an anticipation rejection under section 102. The only rejection before this court is one of obviousness under section 103.

Nevertheless, as explained previously, section 112, paragraph six, requires us and the PTO to construe the "means, responsive to pressure" language recited in claim 1 as limited to a flexible-wall, diaphragm-like structure as disclosed in Schuler's specification, or an "equivalent" thereof. In this regard, the Commissioner has failed to establish the existence in conventional hopper structures like Swift's of any inherent vibrations resulting from pulse-jet cleaning sufficient to loosen hardened dust that gathers on hopper walls.[9] Thus, because the Commissioner's unsupported assertion that Swift's hopper walls would vibrate in response to pressure increases caused by pulse-jet cleaning is mere speculation unsupported by any rational basis for believing it might be true, the burden clearly did not shift to Schuler to establish non-equivalence. Furthermore, the Commissioner has failed to persuade us that such vibration, even if it did occur, should be viewed as making Swift's hopper structure an "equivalent" of Schuler's flexible-wall, diaphragm-like structure.

As to the Commissioner's arguments regarding Swift's slanted hopper walls, we note that neither the examiner nor the Board ever asserted that these slanted walls by themselves represent an "equivalent" of Schuler's flexible-wall, diaphragm-like structure. In

addition, the Commissioner has failed to set forth any reasonable explanation as to how Swift's walls are "responsive to pressure increases."

In summary, Schuler's claimed collector would not have been obvious in view of Swift's collector having hopper walls which are rigid and non-responsive to pressure increases within the collector. In addition, even if the issue of anticipation under section 102 were before us, which it is not, the Commissioner could not have argued anticipation because he has failed to establish that the rigid hopper wall structure in Swift's collector is an "equivalent" of the flexible wall, diaphragm-like hopper structure in Schuler's claim 1 collector.

### CONCLUSION

For the foregoing reasons, we hold, as a matter of law, that Swift does not render the structure defined by claim 1 obvious under 35 U.S.C. § 103, and therefore we reverse the decision of the Board. On the record before us, we see no reason to remand this case for further findings as to "equivalents" as suggested by the Commissioner.

***REVERSED.***

---

9. We note that the Lissy patent discloses a dust collector in which the hopper walls thereof are actuated mechanically by vibrators to loosen caked-on dust so that it can fall to the bottom of the hopper. *Lissy Patent*, Col. 2, lines 4–8; Col. 4, lines 20–27. If conventional pulse-jet cleaning provided sufficient vibrations to loosen caked-on dust, Lissy presumably would not have found it necessary to add vibrators. Similarly, Davis presumably would not have found it necessary to use the inflatable membrane described therein. *Davis Patent*, Col. 4, lines 23–58.