106 F.3d 425
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
In re Paul G. ANDERSON, John A. Mcmennamy, Andrew P. Burke
and Thomas A. Rak.
 Nos. 96-1031, 96-1067.
 United States Court of Appeals, Federal Circuit.
 Jan. 6, 1997.
 
 Before CLEVENGER, Circuit Judge, SKELTON, Senior Circuit Judge, and RADER, Circuit Judge.
 RADER, Circuit Judge.
 
 
 1
 The Board of Patent Appeals and Interferences (Board) affirmed the rejection of U.S. Patent Application serial nos. 07/675,958 of Anderson et al. and 07/668,754 of Burke et al. The Board sustained the examiner's 35 U.S.C. § 112, p 2 (1994) (112(2)) rejection of claim 32, reversed the examiner's prior art rejections of claims 7-33, 35, and 36, and entered a new ground of rejection under 37 C.F.R. § 1.196(b) for claims 7 through 31, 33, 35, and 36 under 112(2). In addition, the Board sustained the 35 U.S.C. § 112, p 1 (1994) (112(1)) rejection of claims 15-22, as well as the 35 U.S.C. § 103 (1994) rejection of Anderson claims 1, 4, and 5 and Burke claim 9. Because appellants have not shown clear error on the section 112(2) or section 103 rejections, this court affirms.
 
 BACKGROUND
 
 2
 This court consolidated the pending appeals of Anderson and Burke on January 19, 1996. Claims 7 through 33, 35, and 36 of Anderson are identical to claims 34 through 60, 62, and 63 of Burke. The applicants added these claims through reissue and continuation to provoke an interference with U.S. Patent No. 4,911,004 to Leon (Leon '004 Patent). For convenience this court addresses the issues in this case in terms of the Anderson claims and specification.
 
 
 3
 The invention detects minute distortions of a generally cylindrical component caused by axial loads. One use of this invention is to determine the axial loading on the valve stem of a motor-operated valve assembly, such as used in the nuclear power industry, in order to terminate driving of the valve stem once the valve has closed tightly. Figures 1 and 2 of the Anderson application illustrate the invention:
 
 Figure 1 Figure 2
 
 4
 Figure 1 illustrates a stem strain transducer 24 attached to a portion of a valve stem 15. When the gate valve 13 reaches the closed position, the axially downward driving force imposes an increasing axial load on the valve stem 15. Transducer 24 senses the axial deformation and produces an output signal proportional to the amount of axial deformation.
 
 
 5
 Figure 2 is an enlarged illustration of the stem valve transducer 24. When the transducer is attached to the valve stem 15, the bolts 35 and 45 are removed. The support plates 28 and 38, along with the upper gripping plates 29 and 39 to which they remain attached, then move relative to the lower gripping plates 31 and 41 in response to axial deformation. This relative movement produces changes in the respective spacings between the mounting brackets 30 and 40, and the opposed surfaces of the lower gripping plates 31 and 41. This slight change in spacing is detected by the sensing devices 32 and 42 which detect small changes in distance. With some calculations, the amount of axial and diametral loading on the cylinder is determined.
 
 
 6
 Anderson claim 32, which is representative of the claims at issue, reads as follows:
 
 
 7
 A device for measuring deformation in a generally cylindrical member comprising:
 
 
 8
 clamp means adapted for removable attachment to a portion of the cylindrical member, the clamp means including a clamp body and first and second clamping members, the clamping members being supported by the clamp body and spaced from one another for receiving a portion of the cylindrical member there between, at least one of the clamping members being movable for engaging and applying compressive forces on the portion of the cylindrical member, the clamping members transmitting deformations in the portion of the cylindrical member to the clamp body causing movement between parts of the clamp body; and
 
 
 9
 proximity detecting means for sensing distance changes between parts of the clamp body resulting from deformations in the portion of the cylindrical member transmitted through the clamping members and for generating electrical signals related thereto.
 
 
 10
 U.S. Patent Application serial no. 07/675,958. (Emphasis added.)
 
 
 11
 Leon's disclosure differs from those of Anderson and Burke. Leon's sensor clamps directly onto the portion of the cylindrical member being measured. Also, Leon calculates axial loading from diametral deformation. On the other hand, Anderson and Burke's sensors clamp onto either end of the portion being measured. These devices measure axial rather than diametral deformations.
 
 DISCUSSION
 THE DEFINITENESS REQUIREMENT
 
 12
 Compliance with the definiteness requirement of section 112(2) is a question of law, which this court reviews without deference. Credle v. Bond, 25 F.3d 1566, 1576, 30 USPQ2d 1911, 1919 (Fed.Cir.1994). According to section 112(2), "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. Claim definiteness depends on whether the inventor's claim language conveys to those skilled in the art the scope of coverage. Credle, 25 F.3d at 1576. The specification informs the meaning of the claims. Thus, claims may be indefinite when a conflict between the claimed subject matter and the specification disclosure renders the scope of the claims uncertain. See In re Cohn, 438 F.2d 989, 993, 169 USPQ 95, 98 (CCPA 1971); In re Moore, 439 F.2d 1232, 1235-36, 169 USPQ 236, 238-39 (CCPA 1971).
 
 
 13
 In this case, the Board rejected claim 32 on the basis of section 112(2). The Board found that claim 32, although clear on its face, was indefinite when read in light of the specification. Specifically, the terms "first and second clamp members" and "clamp body" are vague in light of the Anderson specification. Appellants show no "clamp member" structure in their specification which is permanently "supported by the clamp body." During the measurement operation, the lower gripping assemblies, which appellants suggest comprise, along with the upper gripping assemblies, the "clamp members," are not supported by the support plates, which appellants contend are the "clamp body." Because appellants show no structure in their specification consistent with this claim language, claim 32 is indefinite.
 
 
 14
 The Board further entered new grounds of rejection under section 112(2) as to claims 7 to 31, 33, 35, and 36. Claim 31 contains the same indefinite limitations as found in claim 32. Claims 8, 13, 14, 24, 29, and 30 contain limitations similar to those of claim 32 which require the clamping members to be supported by the "clamp body." As this support cannot occur during the measurement operation, these claims are indefinite as discussed above.
 
 
 15
 Claims 33, 35, and 36 recite in pertinent part, "attaching a clamp portion, having relatively movable clamp parts ... to a portion of a generally cylindrical member for relative movement of the clamp parts ... in response to deformations in the portion of the cylindrical member." (Emphasis added.) Appellants, once again, show no structure in their specification consistent with this claim language. While the upper and lower gripping assemblies do each attach to "a portion" of the generally cylindrical member, these portions are not "the portion" of the generally cylindrical member where deformation is measured. This inconsistency in the definition of "portion" makes these claims indefinite.
 
 
 16
 Similarly, claims 7 and 23 recite in pertinent part "clamp means adapted for removable attachment to a portion of the cylindrical member and for moving in response to axial deformations in the portion of the cylindrical member." (Emphasis added.) Just as discussed above, the upper and lower gripping assemblies attach to "a portion" of the generally cylindrical member which is different than "the portion" which undergoes axial deformation. The inconsistency in the definition of portion also renders these claims indefinite.
 
 
 17
 Finally, claims 15, 16, 21, and 22 contain similar limitations to claims 7, 8, 13, and 14, respectively, and claims 23, 24, 29, and 30, respectfully. These claims are indefinite for the same reasons as the related claims. Thus, since the Anderson specification does not support the claims at issue, the Board correctly sustained the section 112(2) rejection of claim 32, and adding a new ground of rejection under section 112(2) for claims 7 to 31, 33, 35, and 36.
 
 THE NONOBVIOUSNESS REQUIREMENT
 
 18
 The ultimate determination of obviousness is reviewed de novo. In Re Donaldson Co., 16 F.3d 1189, 1192, 29 USPQ2d 1845, 1848 (Fed.Cir.1994) (en banc). However, the determination of obviousness is based upon underlying, and often controlling, factual determinations, which are reviewed for clear error. Dennison Mfg. Co. v. Panduit Corp., 475 U.S. 809, 810-11, 229 USPQ 478, 479 (1986) (quoting Graham v. John Deere, 383 U.S. 1, 17-18, 148 USPQ 459, 467 (1966)). For obviousness, the factual inquiries consist of (1) the scope and content of the prior art; (2) the differences between the claim and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) the objective factors, if any, of non-obviousness. Uniroyal, Inc. v. Rudkin-Wiley Corp., 837 F.2d 1044, 1050, 5 USPQ2d 1434, 1438 (Fed.Cir.1988).
 
 
 19
 The Board determined that Anderson claims 1, 4, and 5 were obvious under section 103 in light of the Ziggel West German Patent 1120754 (the primary prior art reference at issue) and SATEC and Duggan (the secondary references). Appellants contend that the Board erred in this conclusion. Anderson claims 1, 4, and 5 stand or fall with each other and are similar to Burke claim 9.
 
 
 20
 First, Anderson and Burke base their case for non-obviousness on the failure of the Ziggel West German Patent to describe a means or method of securing two discs about a cylindrical shaft. The Board, however, found that the SATEC brochure, as well as skill in the relevant art, make obvious the widespread use of clamps to secure similar measurement devices to cylindrical members. The record supports that finding.
 
 
 21
 Second, Anderson and Burke argue that Ziggel's discs are not capable of the required "independent relative movement" because the interconnecting rods between them will inhibit such movement. However, claim 1 "freedom of movement" is only required for "at least some distance." Such distance may be small. The record shows that nothing prevents one disc from moving independently of the other within the constraints of Ziggel's coupling system.
 
 
 22
 Third, Anderson and Burke argue that claims 1, 4, and 5 (of Anderson) and 9 (of Burke) is not obvious in light of Ziggel because Ziggel does not teach or suggest how to isolate the axial component of deformation from the torque component. The Board notes, however, that appellants' claims do not limit how the "axial component of the relative movement" arises. Therefore, this claim, as the Board correctly discerned, does not preclude detection of an axial component representing both radial and angular movement. This court discerns no clear error in the Board's findings nor error in its conclusions.
 
 DUE PROCESS REQUIREMENTS
 
 23
 In addition, appellants argue they were denied due process. First, they contend that they were denied their due process rights because the Board precluded them from proceeding before the Examiner pursuant to 37 C.F.R. § 1.196(b)(1) (1996). Second, they contend that the Board denied them due process by refusing to designate the rejection of claims 15-22 under section 112(1) as a new ground for rejection.
 
 
 24
 The appellants' first due process argument misconstrues Patent and Trademark Office (PTO) procedure. They argue that the PTO forced them to file both a Rule 1.196(b)(1) request with the Examiner and a Rule 1.196(b)(2) request with the Board in order to preserve their rights to reconsideration by the Board. However, the Manual of Patent Examining Procedures (6th ed.1995) § 1214.06(D)(2) provides:
 
 
 25
 If the appellant elects to proceed before the examiner with regard to the new rejection, see MPEP § 1214.01, part (2), the Board's affirmance will be treated as nonfinal, and no request for reconsideration of the affirmance need be filed at that time.... If the application does not become allowed or abandoned ... once prosecution of the claims which were rejected under 37 C.F.R. § 1.196(b) is terminated before the examiner, the application file must be returned to the Board so that a decision making the original affirmance final can be entered. < The time for filing a request for reconsideration > on the affirmance < or seeking court review runs from the date of the decision by the Board making the original affirmance final.
 
 
 26
 PTO procedure preserves appellants right to seek reconsideration of the affirmed rejections before the Board. By misconstruing PTO procedure and submitting a Rule 1.196(b)(2) request with the Board, appellants waived their right to Rule 1.196(b)(1) review by the Examiner. Because any prejudice to appellants was a self-inflicted wound resulting from their misunderstanding PTO procedure, they have not made a case for a due process violation.
 
 
 27
 The appellants second due process argument is moot. Because this court has sustained the Board's rejection of claims 15-22 as indefinite, appellants have not been denied any due process by the Board's refusal to designate this action as a "new ground" for rejection.
 
 CONCLUSION
 
 28
 Because appellants have demonstrated no clear error on the section 112(2) and section 103 rejections, this court affirms.