MEDIACOM CORPORATION, Plaintiff,

v.

RATES TECHNOLOGY, INC., Defendant.

No. CIV. A. 97–10559–WGY.

United States District Court,
D. Massachusetts.

Dec. 15, 1998.

Steven M. Bauer, Joseph A. Capraro, Robert N. Feldman, Testa, Hurwitz & Thibeault, Boston, MA, for Mediacom Corporation, Plaintiff.

Robert M. Asher, Lee C. Bromberg, Robert L. Kann, Erik P. Belt, Bromberg & Sunstein, Boston, MA, for Rates Technology, Inc., Defendant.

## MEMORANDUM AND ORDER

YOUNG, District Judge.

The plaintiff, MediaCom Corporation ("MediaCom"), seeks a declaration that its Phone Miser product does not infringe two patents owned by the defendant, Rates Technology, Inc. ("Rates"). Rates counterclaims for infringement of both patents. This case was before the Court previously on various motions by the parties, including Media-Com's motion for summary judgment of non-infringement.

On December 15, 1998 the Court heard argument on the meaning of the disputed patent claims. At that hearing, this Court articulated its views concerning the eclectic new species of proceeding spawned by *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), and known generically as a "Markman hearing." The conduct of that hearing, the nature of the questions presented and considered, and the Court's procedural approach to claim construction are all fully discussed in *MediaCom Corp. v. Rates Tech., Inc.*, 4 F.Supp.2d 17, 21–24 (D.Mass.1998).

Following the Markman hearing, the Court construed the claims of one of the patents in dispute based on the language of the claims themselves, the patent specification, and the prosecution history. *See id.* at 30–33. On the basis of this construction, the Court discerned genuine issues of material fact as to each contested claim, and denied summary judgment of non-infringement. *See id.* at 34–35.

As to the other patent, however, after examining the relevant intrinsic evidence, *see Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–85 (Fed.Cir.1996), the Court concluded that it lacked adequate grounding in the relevant art to construe the claims definitively. *See MediaCom*, 4 F.Supp.2d at 27–29. The Court recognized the need for expert guidance, and determined to appoint a technical advisor, selected by the parties, who possessed the necessary technical expertise to assist the Court in its task. *See id.* at 29–30.

The parties have now proposed and the Court has appointed such an expert, Professor John A. Orr of the Worcester Polytechnic Institute. Professor Orr has been given an opportunity to examine the patent and specification, but has not been privy to the briefs of parties or to the Court's earlier opinion. The Court has met with Professor Orr and discussed with him the conventions and tech-

nical aspects of telephony as they are relevant to an understanding of the claims.[1] The Court has also studied various texts on the topic of wiring schematic and block diagrams, and further reflected on the language of the claims and the other intrinsic evidence.

The necessity of examining extrinsic evidence in this case requires some discussion. The Court has resorted to matters outside the patent and prosecution history only after attempting, without success, to construe the patent claims based on those documents. Reference to extrinsic evidence is only justified where the meaning of the terms of a claim cannot be ascertained by reference to intrinsic evidence. *See Vitronics*, 90 F.3d at 1585. In addition to consultation with Professor Orr, the Court has thoroughly examined and considered the extrinsic evidence presented by the parties themselves. *See Fromson v. Anitec Printing Plates, Inc.*, 132 F.3d 1437, 1442 (Fed. Cir.1997). Notwithstanding that the parties and their own experts continue to disagree on the meaning of the claims, the Court is now satisfied that it is "firmly grounded in an adequate understanding of the subject matter of the patent," *MediaCom*, 4 F.Supp.2d at 24, and is in a position to construe the disputed claim language.

## FACTUAL BACKGROUND

A more complete treatment of the accepted facts concerning telephones and telephony appears in the Court's earlier opinion. *See MediaCom*, 4 F.Supp.2d at 24–25. Familiarity with that treatment is presumed in the following discussion. Unless otherwise identified, all facts appear on the summary judgment record and are undisputed.

The telephone network consists of individual telephones, which are each connected to a local central office. Each local central office is connected to long-distance telephone companies and thereby to other local networks.

The circuitry that connects the telephone to the central office performs signaling functions and transmission functions. Signaling functions include directing the central office to seize a line to make a call ("supervision") and dialing the desired number ("addressing"). Transmission refers to the exchange of voice and data over the telephone network. Power to the telephone, signaling, and call routing services are all provided by the local central office.

When the handset of the telephone is resting in the cradle or otherwise inactive, the telephone is said to be "on-hook". In the on-hook state, the local circuitry is open, and no signaling or transmission can occur. When the handset is taken off of the cradle or otherwise activated, the telephone is said to be "off-hook." When the telephone is off-hook, the local circuitry is closed, and the central office supplies power to the telephone. DC (direct current) powers the telephone itself. The telephone transforms that current into AC (alternating current), which enables signaling and transmission to occur.

Both the patented device and MediaCom's Phone Miser product are connected to the circuitry between the telephone and the local network. Both devices intercept the phone number that the user dials in order first to determine the least expensive carrier for that call and then to dial the appropriate access number to route the call through that carrier.

## DISCUSSION

Rates owns United States Patent No. 5,425,085 (the " '085 patent"), which encompasses all of the claims that have yet to be construed. The '085 patent claims a device that automatically routes toll telephone calls to the carrier offering the least expensive rates for each particular call. Only two ele-

---

1. The efficacy of this process can hardly be overstated. I learned more technical data in a 45-minute discussion with Professor Orr than I would have learned in two days of formal testimony. This is not to denigrate cross examination. There is no more fervent exponent of vigorous cross examination than I. But fair cross examination presumes an understanding of the data examined. In recondite fields of scientific endeavor, however, my understanding is deficient and I need help—much like the help one gets from a law clerk in a recondite field of law. I cannot recommend this procedure too strongly. As noted in the text, however, I have throughout drawn my own independent conclusions.

ments of Claim 1 of the patent are in dispute. The relevant claim language recites:

> switch means operatively connected to said first jack means for disconnecting said first telephone from said network,

> means operatively connected to said switch means for generating a current through said switch means to the first telephone, corresponding to a current provided by said network.

Col. 7, ll. 13–19.

## I. Claim Construction

■ The first step in resolving patent infringement disputes is to construe the literal terms of the patent claims. *See Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563 (Fed.Cir.1996). Claim construction is matter of law for the Court to decide. *See Markman*, 52 F.3d at 979. The Court has engaged in a thorough consideration of both claim elements remaining in dispute. The Court's preliminary reflections on these elements are set forth in *MediaCom*, 4 F.Supp.2d at 27–30. The following conclusions build upon that discussion.

### A. "Disconnecting"

■ The first dispute centers on the meaning of the term "disconnecting". The parties disagree on whether the claim restricts the invention to a switch that completely interrupts the flow of electrical current between the network and the telephone jack. MediaCom argues that the ordinary meaning of the terms used indicate a switch that shunts the telephone from the network's electrical current to the local current source that is part of the call rating device. Rates counters that the telephone can and must remain electrically connected to the network at all times during the call in order for the telephone to work properly, noting that a claim construction that has the effect of excluding the preferred embodiment in the specification from coverage by the claims is "rarely, if ever, correct." *Vitronics*, 90 F.3d at 1583. Rates urges a construction that is limited to the disabling of signaling between the telephone and the network, while the telephone remains electrically connected.

The Court looks to the specification, and particularly to the wiring diagram at Fig. 2, to guide the resolution of this disagreement. *See Vitronics*, 90 F.3d at 1582 (stating that the specification "is the single best guide to the meaning of a disputed term"). The diagram is found as Appendix A to this opinion. The Court has already ruled that no special definition appears in the specification to indicate that the words "switch" or "disconnect" are to be given any other than their ordinary meanings. *See MediaCom*, 4 F.Supp.2d at 27; *see generally Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1388 (Fed.Cir. 1992). The Court has further ruled that the "switch means" element is not a means-plus-function claim element governed by the sixth paragraph of 35 U.S.C. § 112. *See MediaCom*, 4 F.Supp.2d at 27; *see generally Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 531 (Fed.Cir.1996).

There are two switch elements represented on the diagram as being operatively connected to the first, or telephone jack. One switch means is represented as No. 36 on the diagram, a "2 From C" switch. In the written specification, the switch is referred to as a "2 Form C" switch. *See* Col. 3, l. 52. The Court concludes that the specification identifies a "2 Form C" switch. "Form C", in the parlance of electrical circuitry, refers to a "single pole, double throw" switch. Single pole indicates that only one wire from the element being switched is connected to the switch. Double throw means that the element may be switched to either of two different connections. This type of switch is distinguishable from a switch which has only on or off states, as opposed to two alternative on states. The 2 in "2 Form C" switch means that there are two switches in the configuration labeled No. 36 in Fig. 2, each having one wire that may be switched and two possible connections that may be made. This interpretation of "2 Form C" is consistent with the explanation offered by Rates' expert, Stephen Burns, Ph.D., *see* Declaration of Stephen K. Burns, Ph.D. at ¶ 12, and has not been the subject of dispute in this action. *See also* Charles J. Baer & John R. Ottoway,

Electrical and Electronic Drawing, (5th ed. 1986) 86 Fig. 3–9.[2]

With the understanding that the 2 Form C configuration controls one pair of wires from the element to be switched and two pairs of wires each representing one possible connection, the Court returns to the diagram at Fig. 2. The switch configuration is connected to seven different wires. One pair leads to the network, or central office (25). One pair leads to the telephone (24). A third pair leads to the local central office (CO) current source (38). The remaining wire leads to an array consisting of the micro-processing unit (50), the RAM chip (52), the EPROM chip (54), and the real time clock (56). Specifically, the wire is connected to the input/output (I/O) bus (66). See Fig. 2.[3]

According to the specification, the function of the switch (36) is to disconnect the telephone from the network and connect it to the device. See Col. 3, Lns. 52–54. Logically, it follows that the pair of wires leading to the telephone jack (24) may be connected by the switch to either the pair of wires leading to the network jack (25) or to the pair of wires leading to the local CO current source (38). The switch thus connects the telephone pair either to the network or to the local CO current source, but not to both.

The specification indicates that the switch (36) is connected to a " 'local CO (central office)' current source (38) which generates a current corresponding to the current supplied by the ... network." Col. 3, ll. 54–55. The local CO current source in turn is connected to a "power supply" (76). Col. 4, Lns. 22–24. Current is thereby supplied to the telephone when it is disconnected from the pair of wires leading to the network. In addition, the switch (36) connects to the

DTMF tone detect (88), which "detects the tones generated from the first phone." Col.4, ll. 41–43. When the user dials a series of digits, the electrical impulses thus pass from the telephone jack (24), through the switch (36), and on to the DTMF tone detect (88), so that the device can identify the telephone number and determine which carrier access code to dial. See Col.5, ll. 16–18, 28–31.

The second switch is represented by the gate-like configuration in the line current detect (40). See Electrical and Electronic Drawing 86 Fig. 3–9. According to the specification, the device "connects to the central office (phone network)." Col. 5, ll. 19–20. This connection is made by means of two additional components: "A combination polarity guard (42) and Direct Access Arrangement (44)(DAA) interfaces and allows communication to the network." Col. 3, ll.64–66. The connection is made when the line current detect (40) senses that the telephone is off-hook, but the ring detect (74) does not sense a ring signal indicating an incoming call.

It is evident from the diagrams and written specification that when a user lifts the telephone handset, two things occur. The switch (36) breaks the circuit that had existed between the telephone and the network, and establishes a new circuit between the telephone and the device. The device itself, however, establishes a new connection with the network, by means of the second switch at the line current detect (40). In broad terms, the device becomes interposed between the telephone and the network by operation of the two switches. Only the switch that disconnects the telephone from the network, however, is claimed.

---

2. It is important to note that the "switch means" element of the claim is not at issue here, and it is not limited to the "2 Form C" variety of switch identified in the specification. See MediaCom, 4 F.Supp.2d at 27 ("switch means" is not a means-plus function claim). It is useful, however, to identify the particular switch identified in the specification, because the Court may thereby gain insight into the operation of the invention and its preferred embodiment.

3. The seventh wire represents a relay. A relay is an "automatic electromagnetic or electromechanical device that responds to a small current

or voltage change by activating switches or other devices in an electric circuit." See American Heritage Dictionary Second College Edition; see also Electrical and Electronic Drawing 84. Such a current or voltage change is produced by the micro-processor when the phone is off-hook, but there is no ring detected, that is, when the user lifts the handset not in response to a ring signal but because he wishes to place a call. See Fig. 3; Col. 5, ll. 16–25. The relay is the mechanism by which the device, in effect, tells the switch to operate.

Rates chooses to characterize this operation as the disabling of the signaling function. While this may be an accurate description of the end result, it is insufficiently complete and precise to allow the finder of fact to evaluate Rates' infringement claim. Yet it is clear that MediaCom's suggestion that there must be a complete interruption of electrical current between the network and the telephone overstates the claim. When one connection is broken, another is established, and it is not possible to establish on the basis of the diagram or the claim language whether or not the telephone remains connected to the network through some other path.

Thus, the term "disconnecting" is not susceptible to either party's proffered construction. Rather, the term "disconnecting" in the context of this patent refers to the interruption of the electrical circuit between the telephone and the network. In the preferred embodiment, the disconnecting is accompanied by the establishment of other circuits; one between the telephone and the device, and another between the device and the network. Those aspects of the preferred embodiment, however, are not claimed as part of the invention. An accused device may, but need not, contain a mechanism for establishing an alternate connection. The Court therefore construes the "disconnecting" element of Claim 1 of the '085 patent to require the interruption—the breaking or opening—of the electrical circuit between the telephone jack and the network.

### B. "Means for Generating"

The parties also dispute the meaning of the generating means element. Media-Com argues that the claim describes an internal power supply that operates when the telephone is disconnected from the telephone network, substituting for the power that would otherwise be supplied by the network. Rates maintains that the claim embraces a number of different kinds of power sources, including devices that modify or regulate current having as its source the telephone network itself.

The Court previously has construed the generating means element of Claim 1 as a means-plus-function claim. *See Media-*

*Com*, 4 F.Supp.2d at 28. In contrast to the "switch means ... for disconnecting" element, the "means ... for generating" element identifies no particular structure that is capable of performing the claimed function. Although there could be many such structures, the patent must particularly point out and distinctly claim each feature of the invention. *See In re Donaldson Co., Inc.*, 16 F.3d 1189, 1195 (Fed.Cir.1994). The Court must therefore look to the specification to find a description of the particular structure that generates current corresponding to the network current. *See* 35 U.S.C. § 112 (means-plus-function claim must "be construed to cover the corresponding structure ... described in the specification and equivalents thereof"); *B. Braun Medical, Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424–25 (Fed.Cir.1997). "If an applicant [employing a means-plus-function claim] fails to set forth an adequate disclosure [in the specification], the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112." *In re Donaldson Co., Inc.*, 16 F.3d 1189, 1195 (Fed.Cir.1994).

As stated above, the specification indicates that the switch (36) is connected to a " 'local CO (central office)' current source (38) which generates a current corresponding to the current supplied by the ... network." Col. 3, ll. 54–55. The local CO current source in turn is connected to a "power supply" (76). Col. 4, ll. 22–24.

The diagram at Fig. 2 in the specification confirms this understanding of the claim. The local CO current source is clearly identified in the diagram, and is connected to the power supply. Two different symbols appear adjacent to the power supply. The symbol that resembles an arrow pointing toward the bottom of the diagram represents a ground connection. *See* Electrical and Electronic Drawing 83, Fig. 3–4. The ground connection symbol appears at various other points on the diagram as well. The other symbol, to the left of the power supply, represents a multicell battery. *See id.* 82, Fig. 3–1. This battery is the only source of power identified on the diagram other than the telephone

network itself, which supplies power to the telephone under ordinary circumstances.

The local CO current source (38) is the only structure that is clearly associated with the claimed function of generating a current corresponding to the network current. In accordance with 35 U.S.C. § 112, it is the only structure available to give definite meaning to the generating means element of Claim 1. It remains for the Court to decipher what specifically is being claimed by the term "local CO current source."

The terms "power" and "current" are both terms of art, having distinct meanings. Electric power, in fact, is understood as a combination of current, which is the moving electrical charge itself, and voltage, which is the difference in electrical potential between two points on a circuit. Thus, the generation of current is not equivalent to the generation of power. A power supply, as a person having ordinary skill in the art would understand it in this context, is the source of electrical energy. The '085 patent specification identifies both a battery and the telephone network itself as the source of electrical energy for the device. "In the present invention, power can be generated from the phone company when the first phone is 'off-hook,' or generated from the battery when the first phone is 'on-hook,'" Col. 4, ll. 24–27.

The "means ... for generating a current" as claimed in Claim 1 is distinct from the power supply. Whether power is drawn from the battery or the network, the current is generated by the local CO current source (38), meaning that whatever power is provided is conditioned or regulated so that it corresponds to the current provided by the network under ordinary circumstances.

Rates' expert, Stephen Burns, states that the term "current source" would be understood by one skilled in the art to refer to any of a number of different configurations of circuitry capable of converting power from the network to a current capable of energizing the telephone. In light of its own investigation, the Court accepts this understanding of the term. This construction is consistent with both the patent specification and the specialized meanings of the terms used in the claim. It is also entirely consistent with

language in the prosecution history suggesting that the local current source is internal to the device. *See MediaCom*, 4 F.Supp.2d at 28–29. Because the current source is distinct from the power supply, it is possible for the invention to be powered from the network, and yet feature an internal current source.

The Court therefore construes the "means ... for generating a current" element, not as the ultimate source of electrical power for the device, but as an intermediate element that conditions or regulates electrical power from a more distant source so that it corresponds to the current that would otherwise have been provided directly by the telephone network, and passes the current through the switch to power the telephone.

## II.  Infringement

The Court has now resolved the parties' disagreement as to the meaning and scope of the patent claim. The task remaining is different in kind. Infringement is a question of fact. On a motion for summary judgment, the Court is not permitted to find facts, or to draw adverse inferences against the non-moving party. Rather, the Court's role is to determine whether there are genuine issues of material fact remaining to be tried. *See* Fed.R.Civ.P. 56.

Although the parties differ widely in their characterizations of various features of the Phone Miser product, the following facts are undisputed. The Phone Miser is a least cost telephone call routing system that is connected to the user's telephone between the telephone and the wall jack leading to the network. *See* Declaration of Robert L. Pokress ¶ 3. The company's application for registration with the Federal Communications Commission describes the product:

> The purpose of the Phone Miser is to automatically reduce the cost of long distance calls. It does this by intercepting the dial string sent by the user's telephone, blocking it from appearing on the network while maintaining loop current. It then redials the user selected number with a long-distance carrier prefix.... After it dials, it goes back to a "pass through"

mode in which the registered equipment behind it [i.e., the telephone] is connected directly to the network through a current sensing optoisolator.

The unit has three states. In the "rest" state, it connects the user's telephone directly to the network. If an incoming call comes, it has a ring detector, which lets it know that the user is picking up the phone in response to an incoming call. In this case, it does nothing. If, however, the user picks up in the absence of an incoming call, the Phone Miser assumes he is going to dial out, and enters an "intercept" state. In this state, a 15mA current source is inserted in series with the user and the telephone line. Loop current is maintained for all of the loop lengths [required by FCC regulations] but a high impedance exists between the user's phone and the telephone line.

The user's DTMF string is monitored, but does not reach the network. As soon as the DTMF string is decoded, the unit dials out, adding the appropriate long distance carrier prefix from its data base. As soon as it is done dialing, it exits the intercept state and reconnects the user telephone directly to the network. The user than [sic] takes over the call in the normal fashion.

Rates' App., Ex. J.

What remains hotly disputed is the ultimate question of infringement. Rates argues that the foregoing description reveals two features of the Phone Miser product that infringe the '085 patent. First, Rates contends, the Phone Miser prevents signaling to the network in its "intercept" state, thereby "disconnecting" the telephone from the network. In this regard, according to Rates' expert, the Phone Miser circuit board is "identical or substantially the same as the embodiment shown in Figure 2 of the '085 patent." Burns Decl. ¶ 43. Second, in order to provide power to the telephone and maintain seizure of the telephone line, the Phone Miser inserts a "15 mA current source" that Rates maintains infringes on the "means ... for generating a current" element of Claim 1.

## A. "Disconnecting"

█ According to Rates' expert, Stephen Burns, the Phone Miser contains solid state switches, which are functionally identical to a "2 Form C" switch, that "disconnect the telephone from the network by redirecting or changing the path of the signaling between the telephone and the network." Burns Decl. ¶ 42–43. Burns states that when the switches are opened, current from the network is shunted into a current regulator, which eliminates the variations that characterize AC current, leaving only DC current to pass back and forth between the telephone and the network, thus preventing signaling from occurring. Id. ¶ 39.

Robert Pokress, President and CEO of MediaCom and one of the developers of the Phone Miser product, disputes Burns' characterizations of the product. "The Phone Miser product does not include a switch, or any other device, for electrically disconnecting the telephone from the telephone network. Moreover, the Phone Miser product allows the telephone to remain electrically connected to the telephone network at all times." Pokress Decl. ¶ 10. Upon closer examination, however, this characterization is somewhat misleading, since Pokress admits that there is a relay, or switch, interconnected between the telephone and the network that opens when the user lifts the handset to place a call. *See id.* In Pokress' characterization, current flows either through the relay, as in the case of an incoming call, or through what he calls an AC filter circuit, as in the case of an outgoing call. Nevertheless, Pokress asserts, "[w]ith the relay in the open (electrically inactive) position, the telephone remains connected to the telephone network through the AC filter circuit." *Id.*

█ If this were a disagreement about the meaning of a patent claim, the Court would be empowered, indeed required, to resolve these conflicting accounts. The infringement analysis, however, both as to the operation and structure of the accused device, and as to the comparison with the patent claims, is one for the finder of fact. *See MediaCom*, 4 F.Supp.2d at 24. Indeed, the familiar distinction between questions of law and fact gives rise to one of the emerging oddities of

patent practice under *Markman*. The issues now reserved for the finder of fact are nearly indistinguishable from those the Court has just resolved as matter of law. The "relative interpretive skills of judges," *see Markman*, 517 U.S. at 384, 116 S.Ct. 1384, are pressed into service to answer interpretive questions bearing the same technical and arcane features that make infringement questions a matter for the jury. This discussion illuminates tensions in the *Markman* framework that are only beginning to emerge as courts wrestle with its mandates. Despite this conceptual incongruity, the law is clear: from this point in the analysis forward, the Court is without authority to resolve genuine disagreements between the parties.

Although the question is a close one, in view of the conflicting accounts of the operation of the accused device, the Court must conclude that genuine issues of material fact preclude summary judgment with respect to the "disconnecting" element.

### B. "Means ... for generating"

■ As to the "means ... for generating" element, it is clear from the statements of both Pokress and Burns that the Phone Miser product powers the telephone using network current that has been passed through a current regulator to produce constant, nonvarying current. Pokress explains that

> the AC filter circuit allows the DC current generated by the telephone network to pass directly to the telephone. The AC filter circuit includes a pair of voltage regulators configured with matching diodes and resistors in a back-to back arrangement to provide a constant DC current,

constant voltage, output signal directly to the telephone.

Pokress Decl. ¶ 11. According to Burns, such a configuration of diodes and resistors, a "voltage regulator", is commonly referred to as a current source. *See* Burns Decl. ¶ 45. This assertion is unchallenged in the record. The usage is also reflected in the catalog description of the Motorola components used in the Phone Miser product. *See* Motorola Linear and Interfaced Integrated Circuits 3–65 Fig. 15, 3–74 to 3–81 (Rates' App. Ex M); Burns Decl. ¶ 45. Finally, according to the FCC registration "a 15mA current source is inserted in series with the user and the telephone line." Rates' App. Ex. J. Thus, there is no genuine dispute with respect to the "generating" element. The Phone Miser product contains a current source that draws power from the network and generates a current to the telephone, as claimed by the '085 patent, and therefore infringes that element.

### CONCLUSION

■ Although the Court concludes that there is no genuine issue with respect to the "generating" element of the '085 patent, there remain unresolved issues with respect to the "disconnecting" element that must be submitted to the trier of fact. Because an accused device must embody every element of the patent claim, *see Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40–41, 117 S.Ct. 1040, 1054, 137 L.Ed.2d 146 (1997), and because neither party has succeeded in demonstrating that it is entitled to judgement, the motions for summary judgment are DENIED.